NEWARK PUBLISHERS' ASSOCIATION, A VOLUNTARY ASSOCIATION CONSISTING OF NEWARK MORNING LEDGER COMPANY, A CORPORATION OF NEW JERSEY, AND EVENING NEWS PUBLISHING COMPANY, A CORPORATION; AND NEWARK MORNING LEDGER COMPANY, A CORPORATION OF NEW JERSEY, PLAINTIFFS-RESPONDENTS, v. NEWARK TYPOGRAPHICAL UNION NO. 103, AN UNINCORPORATED LABOR ASSOCIATION, A SUBORDINATE UNION OF INTERNATIONAL TYPOGRAPHICAL UNION OF THE CITY OF NEWARK, N. J., DEFENDANT-APPELLANT.

Argued October 8, 1956—Decided November 5, 1956.

420

*Mr. Thomas L. Parsonnet* argued the cause for the defendant-appellant (*Messrs. Parsonnet, Weitzman & Oransky,* attorneys).

*Mr. Benjamin H. Chodash* argued the cause for the plaintiffs-respondents (*Mr. Harold Krieger,* on the brief).

The opinion of the court was delivered by

HEHER, J. The defendant union appeals from a summary judgment of the Law Division of the Superior Court directing arbitration under *N. J. S.* 2A :24–3 of an issue arising out of the refusal of the union to permit the Newark Morning Ledger Company, in the publication of the *Newark Star-*

*Ledger,* to use but one of its employees in the operation of three teletypesetter casting machines; and the resolution of the issue, in turn, depends upon the meaning of a collective bargaining agreement made between the parties on April 27, 1955, to run for a term ending April 26, 1958, providing, *inter alia,* paragraph 3 (*a*), that "When additional teletypesetter casting machines are introduced, the manning of casting units shall be negotiated, but at no time during the life of this contract shall a publisher request that a journeyman tend more than three casting units"; and also that, paragraph 26, a "Grievance Committee of four members shall be maintained," consisting of two members selected by the publishers and two selected by the union, for the "settlement" of "any dispute (except as otherwise herein provided) arising under this contract between a signatory publisher and the Union, if such dispute cannot be settled by conciliation between the Union and the Publisher involved," the committee's "decision" to be "final and binding on all parties to the dispute," provided that if the committee shall fail to reach an agreement within ten days from the date of the submission of the dispute, the members of the committee shall appoint "a fifth and impartial member to act as chairman," and the "decision of the majority" shall be "final and binding" but shall not "abridge the fundamental rights reserved by and to the signatory publisher and the Union," and should the four members "fail to agree on a chairman within seven days," the selection shall be made by the "presiding judge of the Superior Court from a list of an equal number of names to be submitted by the Union and the Publishers' representatives," and further that "local union laws not affecting wages, hours or working conditions, and the 1955 General Laws of the International Typographical Union, shall not be subject to arbitration."

The issue concerns the manning of the "comparatively new" teletypesetter casting machine. The union would not allow the operation of three such machines by one employee of the plaintiff publisher. It puts the question thus: "By this (the "manning") we mean that the employer wants

to compel a printer to 'man,' or operate, three machines, while the union, fearful of a substantial increase in individual workload and an equally substantial decrease in job opportunities, is strongly opposed to the operation by one man of more than one machine."

The Superior Court, Judge Foley sitting, found there was "no genuine issue as to any material fact," and "no need for a jury trial as to the issues," and the union had failed in its contractual duty to submit the issue to arbitration; and judgment proceeded accordingly.

The union now says that the question of "the manning of these machines" was "very thoroughly thrashed out during the negotiations leading up to the execution of the current collective bargaining agreement," and it "was prepared to offer full evidence concerning the negotiations, and concerning the fact that this issue was the principal ground of dispute between the parties before its final, but merely temporizing, solution as expressed by the penultimate paragraph of paragraph 3(a) of the contract"; and the "true issue" is stated to be the "meaning of the word 'negotiated,' as here used, and in the context of all surrounding circumstances," said to have special significance "in view of the specific exception made by the grievance and arbitration clause of the contract," *i. e.* the parenthetical clause of paragraph 26, "except as otherwise herein provided"; that the "penultimate paragraph of paragraph 3(a), * * * requiring 'negotiation' of the particular issue, is the only portion of the contract which can possibly be construed as 'providing otherwise' than that this issue should be arbitrated"; that it is obvious from this paragraph, "and certainly would have been clear from the testimony if it had been accepted, that this paragraph was adopted by the parties merely as a stopgap," as a "means of avoiding further dispute at that time, so as to enable the completion of the contract by leaving over for later *argument,* for later 'negotiation,' this problem that was holding up the contract as a whole"; and that subsequent to the execution of the agreement, "Ledger brought in additional teletypesetters, and tried to require one employee to

operate three machines," and the union's refusal framed the issue which resulted in this proceeding.

These are the points made: (a) By the "clear terms" of the contract, "the issue of the manning of teletypesetter machines was not subject to arbitration, but only to negotiations"; (b) Even if it were determined that the contract "did not unambiguously exempt this issue from reference to the grievance committee, there was at least sufficient doubt or ambiguity to require" the admission of evidence of "surrounding circumstances to clarify the intent and meaning of the parties"; and (c) On the latter hypothesis, "the intent and meaning of the parties in the use of the words of the contract were questions of fact," and it was error to deny the union's demand for a jury trial under *N. J. S.* 2A:24–3.

The arbitration clause of the contract, paragraph 26, is clear and explicit in its terms, devoid of all ambiguity calling for explanatory evidence *aliunde*. All disputes "arising under this contract" are made subject to arbitration, save as "otherwise" therein provided. The argument is that there are "only two issues in the entire contract which are, by the contract terms, withheld from the provisions or coverage of the arbitration clause": one, "the unnecessary, and superfluous provision in the next-to-the-last paragraph of paragraph 26," excluding from arbitration the "local union laws not affecting wages, hours or working conditions, and the 1955 General Laws" of International; "the other, and therefore the only real issue withheld from the effect of the arbitration clause is the penultimate clause of paragraph 3a" providing that when "additional teletypesetter casting machines" are introduced, "the manning of casting units shall be *negotiated*"; and that these latter words mean "expressly and clearly that this matter will be submitted to *collective bargaining*, and not to arbitration." It is said that "negotiation," in the "context of labor-management relations," is a "word of art, well understood by the general public as well, meaning *only* the act of bargaining 'across the table,' and excluding from its meaning either the concept of mediation or conciliation, or that of arbitration."

■ But whatever meaning the term "negotiation" may have in other and different contexts, in this setting it does not purport to exclude arbitration; and to hold that it does would be to do violence to a manifestation of intention that is plain and clear and free of all reasonable doubt as to meaning, such as arises by logical and factual inference from the whole of the expression, related to the relevant circumstances and the apparent objects the parties were striving to attain. There is no rational basis for the proposition that the parties designed to exclude from arbitration the "issue of the manning of casting units." If that were in mind, why the qualifying provision of the same clause: "* * * but at no time during the life of this contract shall a publisher request that a journeyman tend more than three casting units"? Considering the mode and manner of expression, it is an entirely reasonable hypothesis that if the parties had in mind the exclusion of the particular issue from the arbitral process, the intention so to do would have been expressed in clear and peremptory terms.

"Any dispute" arising under the contract was made subject to arbitration except as "otherwise herein provided." The local union laws "not affecting wages, hours or working conditions" and the 1955 General Laws of International were expressly excluded; so also, the "differences respecting a succeeding contract," all the subject matter of the last two paragraphs of the arbitration section titled "Grievance Committee," while the "manning clause" is embodied in an entirely different section. And the arbitration clause more definitively provides that arbitration shall be had "if such dispute cannot be settled by conciliation between the Union and the Publisher involved." And is not this controversy concerned with "working conditions"?

"Negotiation" almost invariably attends the particular matter in dispute before resort is had to arbitration or the judicial process, as the case may be; and arbitration is the stipulated mode of resolving the controversy where negotiations between the parties have been fruitless, and the procedure is not expressly barred in the given case. Such is

plainly the use and the significance of the word "negotiated" in the present context. Arbitration was invoked to afford an expeditious determination of disputes and controversies by *quasi*-judicial means. *City of Omaha v. Omaha Water Co.,* 218 *U. S.* 180, 30 *S. Ct.* 615, 54 *L. Ed.* 991 (1910). An exception to this general principle of arbitrament of differences "arising out of (the) contract" here cannot be made to rest upon uncertain implication. There is no discernible reason, related to the expressed contractual policy and purpose, why differences remaining unsettled after futile negotiations should not be submitted to the arbitral jurisdiction rather than the judicial. Otherwise, the intent and purpose of the agreement as a whole could be set at naught, and there is no tangible ground for the inference that the parties intended the agreement should come to an end if this issue could not be "negotiated." Quite the contrary. With the stated specific exceptions, differences and disputes which "cannot be settled by conciliation between the union and publisher" are made arbitrable. In this context, "negotiation" and "conciliation" are convertible terms. See *Phelps Dodge Copper Products Corporation v. United Electrical Radio & Machine Workers of America,* 138 *N. J. Eq.* 3 (*Ch.* 1946), affirmed *Westinghouse Electric Corp. v. United Electrical, etc.,* 139 *N. J. Eq.* 97 (*E. & A.* 1946).

Interpretation is the process of giving meaning to the symbols of expression, taken and compared together in the setting of the circumstances. A subsidiary provision is not so to be interpreted as to conflict with the obvious "dominant" or "principal" purpose of the contract. We seek for the intention of the parties; and to this end the writing is to have a reasonable interpretation. Disproportionate emphasis upon a word or clause or a single provision does not serve the purpose of interpretation. Words and phrases are not to be isolated but related to the context and the contractual scheme as a whole, and given the meaning that comports with the probable intent and purpose; and thus the literal sense of terms may be qualified by the context. *Mantell v. International Plastic Harmonica Corporation,* 141 *N. J. Eq.*

379 (*E. & A.* 1947). That which is patently and unmistakably implied is a constituent element of the contractual intention, just as much so as that which is explicitly expressed in terms. *Krosnowski v. Krosnowski,* lately decided, 22 *N. J.* 376 (1956). The distinction is between word symbols that are to be regarded as "directly" promissory and words "the meaning of which is not so clearly apparent," but the process is one of true interpretation; it concerns "a promise that the promissor himself made, but a promise that he did not put into promissory words with sufficient clearness to be called an 'express promise' "; there are "implications in English words as well as in other signs and symbols," and "what your words imply is also what your words express." *Corbin on Contracts, sections* 18, 561, 562.

Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement, even where the contract is free from ambiguity, not for the purpose of changing the writing, but to secure light by which its actual significance may be measured. Such evidence is adducible simply as a means of interpreting the writing,—not for the purpose of modifying its terms, but to assist in determining the meaning of what has been said. So far as the evidence tends to show, not the sense of the writing, but an intention wholly unexpressed, it is irrelevant. *Atlantic Northern Airlines v. Schwimmer,* 12 *N. J.* 293 (1953). We are not at liberty to introduce and effectuate some supposed unrevealed intention. The actual intent of the parties is ineffective unless made known in some way in the writing. It is not the real intent but the intent expressed or apparent in the writing that controls. *Corn Exchange National Bank & Trust Co. v. Taubel,* 113 *N. J. L.* 605 (*E. & A.* 1934). And the construction of the integration is the exclusive province of the judge, unless an issue of fact be raised by evidence *aliunde.* *New York Sash & Door Co., Inc., v. National House & Farms Association,* 131 *N. J. L.* 466 (*E. & A.* 1944).

Here, there was no undue exclusion of evidence *aliunde* on the hypothesis of an ambiguous contract, or otherwise.

The meaning of the writing is clear, assessed as an entirety, and there was no demonstrable error of substance in the asserted exclusion of evidence "as to the intent and meaning of the parties"; and, by the same token, there was no denial of the right of trial by jury. The offer of proof had to do, not with the interpretive function, but rather the use of the preliminary negotiations to vary and enlarge the terms of the writing, indisputably intended by the parties to be a final and complete memorial of their bargain, the integration of the jural act, and hence the exclusive repository of the common intention as a rule of substantive law.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING and JACOBS—5.

*For reversal*—None.