**STV ENGINEERS, INC.,**
Appellant No. 88–1141

v.

**GREINER ENGINEERING, INC.,** Callahan, Frank T., Bowen, William H., Cleveland, Russell, Lenagh, Thomas H., Meyers, Harold J., Serafine, E. Max, Costello, Robert L. Sawyer, James, Militello, Sam, and Gunther, William E., Jr.

**STV ENGINEERS, INC.,**

v.

**GREINER ENGINEERING, INC.,** Callahan, Frank T., Bowen, William H., Cleveland, Russell Lenagh, Thomas H., Meyers, Harold J., Serafine, E. Max, Costello, Robert L. Sawyer, James, Militello, Sam, and Gunther, William E., Jr.

**Appeal of GREINER ENGINEERING, INC.**

Nos. 88–1141, 88–1150.

United States Court of Appeals, Third Circuit.

Argued Aug. 29, 1988.

Decided Nov. 14, 1988.

Rehearing and Rehearing In Banc Denied Dec. 9, 1988.

Philip P. Kalodner (argued), Philadelphia, Pa., for appellant/cross appellee STV Engineers, Inc.

Raymond K. Denworth, Jr. (argued), Mark M. Wilcox, Lawrence A. Nathanson, Drinker Biddle & Reath, Philadelphia, Pa., for appellee/cross appellant Greiner Engineering, Inc.

Before SLOVITER, GREENBERG and COWEN, Circuit Judges.

OPINION OF THE COURT

COWEN, Circuit Judge.

## I.

In this case, STV Engineers, Inc. ("STV") seeks damages for an alleged breach of a provision of a Letter of Intent it signed with defendant Greiner Engineering, Inc. ("Greiner"). The Letter of Intent expressed a preliminary agreement between STV and Greiner that STV would acquire Greiner for a particular price. The provision at issue is a standard "no shop" provision, which barred Greiner or its representatives from soliciting a competing offer.

The district court found that Greiner breached the "no shop" clause when a group of Greiner managers sought financing for a competing management-led offer to purchase Greiner. Because we find that the district court erred when it construed the "no shop" clause to bar Greiner managers from seeking outside financing for a management buy-out proposal, we will reverse the district court's finding that Greiner breached the "no shop" provision. We hold that absent unusual facts not present in this case, a company's managers do not act for the company or as company representatives when they seek outside financing for a management-led buy-out.

## II.

In the Spring of 1986, STV and Greiner, two publicly traded companies in the business of providing professional engineering services, were involved in discussions regarding a possible merger. After a period of discussions, the two agreed on the parameters of a transaction in which STV would purchase Greiner's 1.8 million outstanding shares of stock for $18 a share.

A Letter of Intent was drafted to incorporate the agreed upon terms, and was approved by STV's Board of Directors on May 6, and Greiner's Board of Directors on May 7.

The Letter of Intent included a provision, at issue in this case, which provided that Greiner would not solicit or encourage a competing acquisition proposal. That provision, included as paragraph seven of the Letter of Intent, reads:

> 7. *Greiner will not, and will not permit its representatives to, solicit or encourage any acquisition proposal;* provided, however, that Greiner may furnish information concerning its business, properties or assets in respect to another solicitation if counsel to Greiner advises Greiner's Board of Directors that there would be a significant risk of liability on the part of the members of Greiner's Board of Directors as a result of failure to furnish such information to such other person. If an acquisition proposal is received by Greiner or any such information is so furnished, Greiner will promptly notify STV of such fact. Greiner may terminate this Letter of Intent at any time prior to the execution of the Agreement if it shall receive any acquisition proposal from any other person, which in the judgement of Greiner's Board of Directors is materially more favorable to its shareholders than the merger contemplated by this Letter of Intent. Greiner and STV have agreed that the provisions of this Paragraph 7 shall be legally binding upon them in accordance with the laws of Pennsylvania in consideration of the proposal made by STV and the time and expenses incurred by both STV and Greiner with regard to the proposal.

App. at 1464 (emphasis added).

Although the Letter of Intent was, by its terms, a "non-legally binding Letter of Intent," App. at 1462, its final paragraph noted that "neither party shall have any legally binding obligation to the other (whether under this Letter of Intent or otherwise), except under Paragraph 7." App. at 1464.

After the Letter of Intent was approved by the companies' boards of directors, STV began efforts to meet the conditions precedent to the merger, which included securing financing, negotiating a merger agreement, and conducting a due diligence investigation. While the parties disagree on the progress of those efforts, they apparently agree on the fact that STV was proceeding in good faith to meet the conditions necessary for the merger to succeed. The district court found that "[i]t is fair to say that the proposed merger ... was on a track at the time of the termination." App. at 1377. The district court also found, however, that "there was much, much more to be done with regard to financing and there was serious doubt that it would ever get off the ground." App. at 1391.

After the Letter of Intent was signed, Greiner executives were informed of the proposed merger.[1] A number, apparently, were not enthused, and began organizing to investigate alternatives. The district court found that certain executives organized, collected contributions to pay for legal advice, and began investigating sources for financing a management-led leveraged buy-out. Specifically, two top managers, Sawyer and Militello, were found by the district court to have collected information regarding Greiner finances and sent it to Stewart Kahn, of Westinghouse Finance, whom they had contacted with regard to financing a management led buy-out.

At Sawyer and Militello's request, Kahn sent Frank T. Callahan, President and CEO of Greiner, a letter which indicated that "Westinghouse [was] prepared to make a proposal for the management buy-out of the shareholders ... at a price of approximately $19 per share." App. at 1517.

On June 9, 1986, Greiner's Board of Directors met to discuss the management buy-out proposal. After speaking with Kahn and verifying Westinghouse's interest in financing the proposal, the board voted to terminate the Letter of Intent so that it would be free to accept the managers' higher offer. Ultimately, the managers were unable to complete their proposed purchase and Greiner asked STV to reinstate its proposal. STV, however, refused, and responded to Greiner's renewed overture with this lawsuit.

After a bench trial on liability and certain damage issues, the district court ruled that Greiner had breached paragraph seven of the Letter of Intent. Specifically, the district court found that Sawyer and Militello had been acting as "representatives" of Greiner, as that term is used in paragraph seven, and that their contact with Westinghouse was a "solicitation" prohibited by the Letter of Intent. In so finding, the court rejected testimony that Sawyer and Militello, and the other managers participating in the management buy-out proposal, were acting as individuals. The district court reasoned that since the managers had little capital of their own, supplied Westinghouse with information about Greiner's finances, and planned to pledge Greiner assets to finance their bid, they could not be characterized as acting as individuals but instead were acting as representatives of Greiner.

The district court, however, found that STV would not have been able to complete the merger in any case, and limited STV's damages to $129,538 of reliance damages, rather than hearing evidence on and determining the value of the merger to STV. The court reasoned that "that breach could not be said to have been a cause of the inability of the merger to take place because of the speculative nature of the outcome of the many, many features of the merger that had yet to be completed...." App. at 1390–91.

In its appeal, STV argues that the district court erred when it limited STV's damages to reliance damages, when it precluded STV from presenting evidence on the value of the benefit of the merger, and

---

1. Except for Frank T. Callahan, Greiner's President and CEO, Greiner executives were not involved in the merger negotiations. The negotiations were conducted primarily by William H. Bowen, the Chairman of Greiner's Board of Directors, and Russell Cleveland, another Greiner director.

when it made certain evidentiary rulings and findings of fact. ·

Greiner argues in its cross-appeal that the district court erred when it found that those Greiner executives participating in formulating the buy-out proposal breached paragraph seven when they sought outside financing for their proposal. It also argues that since none of the other facts put forward by STV could constitute a breach of paragraph seven, the district court's finding that Greiner breached the "no shop" clause should therefore be reversed.

In opposition to Greiner's cross-appeal, STV argues that in addition to the Sawyer/Militello effort to secure financing from Westinghouse, other actions of Greiner executives constituted breaches of paragraph seven. Specifically, STV argues that Greiner executives breached paragraph seven when they failed to stop the management group from pursuing the purchase, and when the Greiner Board, on June 9, terminated the Letter of Intent in response to a management proposal (supported by a letter from Westinghouse Finance) to purchase Greiner.

### III.

### A.

Because the issues raised in Greiner's cross-appeal, if resolved against STV, render the issues raised by STV's appeal moot, we will consider the cross-appeal first.· The central issue of the cross-appeal is whether the Greiner managers were acting as individuals, or for Greiner or as its "representatives" when they engaged in a variety of actions to further the management buy-out proposal.[2] The scope of our review of the district court's determination that Sawyer and Militello were acting as Greiner's "representatives" when they contacted Westinghouse merits further discussion.

The district court's factual findings, of course, are reversible only if clearly erroneous. Fed.R.Civ.P. 52(a); *Ram Construction Company, Inc. v. American States Insurance Company,* 749 F.2d 1049, 1052 (3d Cir.1984) (*"Ram Construction "*). To the extent, however, that the district judge's decision involves the construction of a clear contractual term, or the application of that construction to the facts of the case, our review is plenary. *Ram Construction,* 749 F.2d at 1053. While the interpretation of an ambiguous contractual term is a matter for the factfinder, determining whether contractual terms are clear or ambiguous is a question of law. *Kroblin Refrigerated Xpress, Inc. v. Pitterich,* 805 F.2d 96, 101 (3d Cir.1986).

In assessing whether the district court was interpreting or construing paragraph seven when it determined that Sawyer and Militello were acting as "representatives" of Greiner, we are mindful of the principles announced in *Ram Construction.* As that case noted, when a court determines the legal effect of an agreement on an event not foreseen by the parties, it is construing, not interpreting a contract. *Ram Construction,* 749 F.2d at 1053. "Construction, which may be usefully distinguished from interpretation, is a process by which legal consequences are made to follow from the terms of the contract and its more or less immediate context, and from a legal policy or policies that are applicable to the situation." *Ram Construction,* 749 F.2d at 1053, *quoting* Patterson, *The Interpretation and Construction of Contracts,* 64 Colum.L.Rev. 833, 835 (1964).

Clearly, determining the meaning of the term "representatives" involves construction, and not interpretation of the Letter of Intent. While the term "representatives" is not defined in the Letter of Intent, its meaning is clear from the context in which it used. In the context of the "no shop"

---

**2.** In reaching this issue of contractual construction, we find, in accordance with our opinion in *Channel Home Centers v. Grossman,* 795 F.2d 291 (3d Cir.1986), that the Letter of Intent is enforceable as a contract. The dissent's argument that our holding undermines *Channel Home Centers* is simply wrong; the fact that we

find the Letter of Intent to be an enforceable contract should in no way affect this Court's determination of whether it is correct to construe the Letter of Intent to bar Greiner managers from seeking financing for a management-led buy-out.

clause of the letter of intent, it is clear that a "representative" of Greiner would include any board member, officer, employee, or outside representative, such as an attorney or investment banker, who is acting on behalf of the corporation to attract or solicit a competing bid. Determining whether a top manager seeking financing for a management-led buy-out is acting as a "representative" thus involves the determination of historical facts, and the construction, not the interpretation, of the Letter of Intent. This is so because we are asked to apply the unambiguous contractual term "representatives" to an event not foreseen by the parties—an effort by STV's top managers to obtain financing for a management-led buy-out.[3] We review the district court's findings of fact for clear error, and our review of the district court's construction of the Letter of Intent is plenary.

### B.

■ In our view the district court erred when it determined that Sawyer and Militello were acting as "representatives" of Greiner when they sought outside financing for the management-led buy-out proposal.

Initially, we find no error with the district judge's factual findings related to this issue. Clearly, Sawyer and Militello contacted Kahn, seeking Westinghouse's assistance in financing the management led buy-out proposal. It is also clear that the managers provided Kahn with information about Greiner's finances because they had little of their own capital, and intended to leverage the assets of Greiner in financing the proposed buy-out.

On the other hand, the facts are clear that Sawyer and Militello intended to act only on behalf of the management group they had helped organize to buy out Greiner. They specifically noted that they were acting as individuals, and not on behalf of Greiner, in their discussions with Kahn. Additionally, the management group independently consulted legal counsel to advise it in its effort to purchase Greiner, and Sawyer and Militello sought the advice of that counsel.

The issue, then, is whether the district court erred when it construed the Letter of Intent to bar the actions of Sawyer and Militello.[4] We are convinced that it did. Corporate managers—even top managers—are not stripped of the ability to act as individual investors, or as a group of individual investors, when they enter into an employment relationship. Sawyer and Militello did all they could reasonably be expected to do to make it clear that they were *not* acting on behalf of Greiner when they contacted Kahn. STV presented no direct or circumstantial evidence of an agreement between Sawyer and Militello and the Greiner Board that they seek an offer on behalf of the Board. Since the managers were not holding themselves out as representatives of Greiner, and were not in fact representatives of Greiner, the district court's construction of the words "Greiner [or] its representatives" to include Sawyer and Militello's actions in this case stretches the meaning of the word "representatives" so far that the construction cannot logically be maintained.

3. The dissent's argument that we must interpret and not construe the Letter of Intent is predicated on its conclusion that "[t]he solicitation of an outside offer by representatives of Greiner clearly was an event contemplated by the parties." Dissent typescript op. at 7.

While this conclusion is undoubtedly correct, the dissent begs the more germane question of whether the parties contemplated an attempt by Greiner managers to obtain financing for a management-led buy-out. Since we conclude that the parties did not contemplate this possibility when they prohibited Greiner "representatives" from soliciting an outside offer, we must construe, and not interpret the term "representatives."

4. It appears from the district judge's opinion that he may have perceived his role to be to determine, as a matter of fact, whether Sawyer and Militello were acting as Greiner "representatives." This determination, however, involves the application of a legal construction of the Letter of Intent to historical facts; it is not a factual determination. Since we find no error in the judge's discussion of the historical facts, we treat his conclusion as being the result of an erroneous legal construction of the Letter of Intent.

The district judge reasoned that the fact that the managers intended to finance their proposed acquisition by leveraging Greiner assets meant that they were acting on behalf of, and as "representatives" of Greiner. However, the fact that a person plans to borrow against an asset he is purchasing should not be legally interpreted to mean that he acts on behalf of or as a representative of the asset.

The crucial inquiry is whether Sawyer and Militello were acting on behalf of the corporation, and at the direction of those entrusted with governing the corporation, or on their own behalf. Since the managers did not purport to act, and were not in fact acting on behalf of Greiner's Board of Directors, their actions did not breach paragraph seven.[5]

We would also note that policy considerations support our construction of the contract. The district court's construction would permit a corporation, by agreeing to a standard "no shop" clause, to bar its managers from pursuing a management buy-out. In addition to limiting the personal freedom of the managers, such a result has the effect of denying stockholders the opportunity to benefit from the potential of a superior bid from a group of people who know the most about the business, and may also have other, sentimental reasons to purchase the company at a premium price.

### C.

STV points to two additional alleged acts which it asserts constitute breaches, by Greiner, of paragraph seven. These alleged acts were not addressed in the district court's opinion or findings of fact. However, since these acts, if proven, would not have constituted a breach of paragraph seven as we construe it, we need not remand this case for further fact finding.

First, STV alleges that when Greiner's top executives and Board failed to stop the managers' effort to formulate an offer to purchase Greiner, they breached paragraph seven. STV argues that this was a breach of paragraph seven's promise not to permit Greiner's representatives to solicit competing offers. However, this argument assumes that the managers were acting as representatives of Greiner when they attempted to formulate an offer. Once we conclude that the district court erred when it construed the managers to be acting as Greiner "representatives," the Board had no responsibility under paragraph seven to stop the managers.[6]

Second, STV's allegation that the Board breached paragraph seven when it terminated the Letter of Intent ignores the fact that the Board had a competing proposal, from the managers, to purchase Greiner. Such a proposal, if superior to STV's, was explicitly stated by paragraph seven to be a ground for termination of the Letter of Intent. STV's attempt to ignore the management proposal and treat the Board's action as a response to a Westinghouse "marketing letter" is unpersuasive.

### IV.

Because we are persuaded by the arguments presented in Greiner's cross-appeal that Greiner did not breach paragraph seven of the Letter of Intent, we need not reach the arguments presented in STV's appeal, and will dismiss it as moot.[7] We will reverse the judgment of the district court in favor of STV in the amount of $129,538, and remand for entry of a judgment in favor of the defendant, Greiner Engineering, Inc.

SLOVITER, Circuit Judge, dissenting.

I respectfully dissent from the majority's decision. The majority's conclusion ren-

---

5. Of course, Sawyer and Militello may have had sentimental as well as personal business reasons for pursuing the buy-out. Whether they were acting for reasons of personal sentiment or personal profit, however, does not affect our determination of whether they were acting as "representatives" of the corporation.

6. Indeed, the Board might have been breaching its fiduciary responsibility to its shareholders if it tried to stop the managers' effort to make a superior bid for Greiner.

7. STV has not argued before this Court that it is entitled to recovery under any theory other than that Greiner breached paragraph seven.

ders the no-shop provision of the Letter of Intent nugatory and undermines this court's recent holding in *Channel Home Centers v. Grossman*, 795 F.2d 291 (3d Cir.1986), which permits enforcement of such letters as contracts requiring the parties to proceed thereafter in good faith. Of even more concern is the majority's reversal of the district court's factual finding that representatives of Greiner breached the binding terms of paragraph seven of the Letter of Intent between STV and Greiner by soliciting an outside offer. The district court's finding of a breach of paragraph seven involved "interpreting" the meaning of this provision as intended by the parties, a function of the district court as trier of fact, and thus can be reversed by this court only if there has been clear error. I believe that the majority's holding that the finding of the district court is subject to plenary review because the court was "construing" the contract results from a misreading of *Ram Construction Co., Inc. v. American States Insurance Co.*, 749 F.2d 1049 (3d Cir.1984).

## I.

After a bench trial, the district court made findings of fact as required under Rule 52, which fully set forth the history of the negotiations culminating in the Letter of Intent, the intent of the parties, and the participation of Greiner's highest officer group in the subsequent events which resulted in the breakup of the STV–Greiner deal. Significantly, neither the defendants nor the majority challenge any of the relevant facts, which are only sparsely alluded to by the majority.

The initial discussions with STV on behalf of Greiner were conducted by William H. Bowen, who was Chairman of Greiner's Board and its principal shareholder, controlling approximately 15% of its stock, and Russell Cleveland, a Greiner director who owned 6% of the stock. In its original draft of the Letter of Intent, STV sought a million dollar termination fee and an opportunity to acquire the 22% stock share of Bowen and Cleveland in the event Greiner ultimately accepted a higher offer from another bidder. These provisions were deleted in favor of the Letter of Intent as revised.

Paragraph seven of the Letter of Intent, expressly made to create legally binding obligations, stated that "Greiner will not, and will not permit its representatives to, solicit or encourage any acquisition proposal" and required that "[i]f an acquisition proposal is received by Greiner or any ... information [concerning Greiner's business, properties or assets] is furnished [in respect to another solicitation], Greiner will promptly notify STV of such fact." App. at 1464. Significantly, the Letter of Intent was signed on behalf of Greiner not only by the negotiating team of Bowen and Cleveland but also by Frank T. Callahan, Greiner's president and chief executive officer.

The district court found that paragraph seven was agreed to by Greiner "in response to STV's concern that Greiner not use the STV offer to build on or be a springboard for other offers or to put the company in some sort of an auction circumstance or in play for a bid from some other source at a higher price." App. at 1362–63. Yet this is precisely what happened and, despite our opinion in *Channel* holding letters of intent are binding if so intended by the parties, the majority holds the provision had no real effect.

On the very day on which the Greiner board agreed to the Letter of Intent, Greiner's vice-president and chief operating officer, James E. Sawyer, and the manager of Greiner's largest regional division, Sam Militello, were "if not participating fully, at least pursuing some interest" in soliciting another institution to provide financing to permit a management buy out of Greiner. App. at 1372. This search may have originally been intended only to solicit financing from several institutions on the employees' own behalf, and therefore arguably was not barred by paragraph seven. As the district court found, "the effort by the employees in trying to have their own buy-out [did not interfere] with STV's or Greiner's obligations to proceed as they envisioned in the letter of intent." App. at 1387.

But, as the district court further found, when "the representatives of this management group ... went outside of Greiner and communicated with Westinghouse, ... they breached paragraph 7." App. at 1389. Westinghouse's own representative, R. Stewart Kahn, testified that "the strength of the management buy-out was coming from four or five top key senior management people, including Militello, Sawyer, [Robert L.] Costello, [vice president and secretary of Greiner] and Callahan," app. at 1374, who was one of the signatories of the Letter of Intent.

The court found that "[f]rom May 25th through June 6th, information about Greiner was being furnished to Westinghouse in furtherance of the solicitation of Westinghouse." App. at 1374. This information about Greiner's assets and financial status was collected from various departments of the company. Militello and Sawyer reviewed a draft of a letter from Westinghouse which was to be directed to Greiner's board and proposed working changes to strengthen Westinghouse's offer. Callahan, who I stress was the chief executive officer of Greiner and a signatory to the Letter of Intent, was informed of the employee meeting on May 21 shortly thereafter and was advised by his vice-president Sawyer and Militello by at least May 24 that there were negotiations with Westinghouse.

Despite the notification requirements in paragraph seven, STV was notified neither of the solicitation efforts by Greiner's management nor that Greiner employees had furnished what appears to be confidential information about the company to Westinghouse. Callahan did not inform STV of Westinghouse's interest in Greiner until June 6, when Callahan received the formal letter from Kahn stating that Westinghouse was "prepared to make a proposal for the management buyout of the shareholders" through funds advanced by Westinghouse, secured by the assets of Greiner. App. at 1519.

Based on these facts and others, the district court found that when members of the management group, including Sawyer and Militello, communicated with Westinghouse, assembled information about the company's finances and sent it to Mr. Kahn, pledged the company's assets, and "encouraged" Westinghouse to make an alternative acquisition proposal, they were acting "in the name of the corporation and not themselves" and thus caused Greiner to breach paragraph seven. App. at 1389.

## II.

The court's finding that the members of the management group were acting as representatives of Greiner in assembling and providing information about Greiner's assets and encouraging and assisting Westinghouse in making an alternative acquisition proposal is a finding of fact, reviewable under the clearly erroneous standard. The majority eschews analyzing that finding for clear error, relying instead on *Ram Construction Co., Inc. v. American States Insurance Co.*, 749 F.2d 1049 (3d Cir.1984), for its exercise of plenary review.

In *Ram Construction*, we distinguished between the "interpretation" of contracts which, because it entails discerning the meaning of the words used by the parties, is a factfinding reviewed for clear error, and the "construction" of contracts which, because it entails application of the law to determine the legal effect of these words, is subject to plenary review. *Id.* at 1053. As explained in Corbin's authoritative treatise, interpreting a contract involves discerning the meaning of the communications between the parties, *see* A. Corbin, 3 *Corbin On Contracts* § 534, at 10 (1960), and thus involves ascertaining the "parties' intent." *See, e.g., John F. Harkins Co., Inc. v. Waldinger Corp.*, 796 F.2d 657, 659–60 (3d Cir.1986), *cert. denied*, 479 U.S. 1059, 107 S.Ct. 939, 93 L.Ed.2d 989 (1987). Construction of the contract, on the other hand, involves giving the intent of the parties legal effect. In the course of construction, a court may fill in gaps in the terms of an agreement when, for example, "long after the parties have made their agreement, an event occurs that they did not foresee." A. Corbin, *supra*, at 11–12. This process is referred to as construction,

not interpretation, as it cannot accurately be said that the court is discerning the parties' intent. *Id.* at 12.

In this case, the ambiguity that requires interpretation is the meaning and scope of the paragraph seven reference to "representatives." Indeed, the difference between the district court's view of that word and the view of the majority evidences its ambiguity.

The majority blurs the distinction between "construction" and "interpretation" in holding that when the district court determined that Sawyer and Militello were acting as Greiner representatives, the district court was engaged in the process of construction because it was determining "the legal effect of an agreement on an event not foreseen by the parties." Majority op. 787, *supra.* The solicitation of an outside offer by representatives of Greiner clearly was an event contemplated by the parties; this possibility was precisely what the parties intended to prohibit in paragraph seven. The district court's determination that Sawyer's and Militello's actions caused Greiner to breach paragraph seven involved both ascertaining the activities that the parties intended to prohibit through the language of this paragraph and making factual findings as to whether such activities occurred. Both of these determinations are questions of fact, reviewable under the clearly erroneous standard of Fed.R.Civ.P. 52. *See Cooper Laboratories v. International Surplus Lines,* 802 F.2d 667, 671 (3d Cir.1986) (parties' intent reviewable under Rule 52). There was more than ample evidence to support the district court's findings, and they therefore should have been left undisturbed.

The majority seeks to divorce the actions of Greiner's chief executive group from Greiner itself. This is simply wrong. The supply of data by high company officers, those the district court held "had authority to give out knowledge and information on company letterheads," app. at 1388, which was a violation of Greiner's contract, imposed liability on Greiner, whether or not the officers were authorized to act as they did. It does not differ in principle from imposition of corporate liability for other unauthorized acts by company management, such as, for example, price-fixing activities.

Moreover, section seven bound Greiner, and certainly its signatory Callahan, not to "permit its representatives to, solicit *or encourage* any acquisition proposal." Thus, when Callahan contributed $1,000 on behalf of a competing proposal via his son, *see* app. at 581–82, 828–38, 1474, and failed to take any steps to try to nip in the bud the shopping activities of the management group, that alone was ample evidence of a breach for which STV was entitled to recover damages.

To the extent that the majority is "construing" paragraph seven, and is holding that standard "no shop" provisions may not bind the company's top management, I believe that the majority is establishing an unprecedented rule of law in the absence of legal authority or a persuasive rationale. A company can act only through the individuals who lead it. The Greiner board itself construed the reference to Greiner in the Letter of Intent to include the company's officers. App. at 1523. While it is possible, as the district court held, that "no shop" clauses do not bar management takeovers *per se*, persons dealing with a company are entitled to rely on the good faith of its management. In this case, management undermined the company's agreement by soliciting Westinghouse's participation in management's proposal, and it is evident from the record that Westinghouse contemplated an equity interest in the very company that had promised not to shop for a better offer. The facts on this record amply support the district court's factual findings, and I would uphold its award to STV of reliance damages in the amount the parties agreed covered STV's expenses in connection with the negotiation of the Letter of Intent and the merger efforts.