WALTER A. KROSNOWSKI, PLAINTIFF-APPELLANT, v. IGNATZ J. KROSNOWSKI AND GARFORD TRUCKING, INC., DEFENDANTS-RESPONDENTS.

Argued October 1, 1956—Decided October 29, 1956.

*Mr. Morris M. Schnitzer* argued the cause for appellant (*Mr. Meyer E. Ruback,* on the brief; *Messrs. Ruback & Albach,* attorneys).

*Mr. G. Kenneth Brown,* of the New York Bar, argued the cause for respondents, by leave of court (*Mr. William Rubin,* on the brief).

The opinion of the court was delivered by

HEHER, J.   The action here is to foreclose one of 11 mortgages covering certain parcels of real property in New Jersey, given September 28, 1955 by the corporate defendant, Garford Trucking, Inc., to the individual defendant, Ignatz J. Krosnowski, to secure the payment of $400,000, an obligation assigned, in turn, by the latter to the plaintiff, Walter A. Krosnowski, as collateral security for the payment of

$190,000 to the plaintiff, each representing an interest in common with other members of the Krosnowski family, as will presently appear.

Both the corporate mortgage debt of $400,000 and the individual indebtedness of $190,000 would in the regular course mature in three years approximately from September 28, 1955; and the basic issue concerns the legal consequence of a conceded default in the payment of a quarter-annual installment of interest which accrued January 2, 1956 on the $400,000 mortgage debt under a provision of the mortgage, invoked by the plaintiff, for the immediate payment of principal and interest in the event of a "default in the performance" of the mortgage or a contemporaneous agreement in writing between the parties, to be set forth presently.

The plaintiff and the individual defendant are brothers. They and other members of the family were the holders of the capital stock of the corporate defendant, and creditors of the corporation as well. In 1955 the corporation filed a petition for relief under Chapter XI of the Bankruptcy Act; and the proceeding was eventually terminated by the approval of a plan which classified the corporate creditors in two groups: Class 1 and 2, the latter comprising the members of the Krosnowski family, and the former including all other general creditors. The plan provided for the giving of mortgages and pledges of corporate assets for the security of the family creditors, in part subordinate to the claims of Class 1 creditors.

By the agreement of September 28, 1955, the corporation's indebtedness to the family creditors was fixed at $400,000. The corporation agreed to secure the debt, with interest at 5%, by 11 real estate mortgages. As between themselves, the family divided into two groups: the "Baltimore Group" headed by plaintiff; and the "I. J. Group," represented by the individual defendant. The Baltimore Group sold its interest in the stated corporate debt and the corporate stock and the stock of a subsidiary corporation to the I. J. Group for $225,000, of which $35,000 was paid on account; the payment of the balance of $190,000 was deferred until the

discharge in due course of the moneys due to the Class 1 creditors under the plan of reorganization approved in the Chapter XI Proceeding, and meanwhile interest was to be paid thereon quarter-yearly at the rate of 5%. As security for the indebtedness of the I. J. Group to the Baltimore Group, the former assigned not merely their own interest in the corporate debt, mortgages and corporate stock, but also the interests acquired from the Baltimore Group in the same assets.

January 2, 1956 was the day appointed for the payment of the first installment of interest on both the individual debt of $190,000 and the corporate debt of $400,000, but neither was paid; and, the default continuing after notice given January 12 following that unless "interest due * * * on the amount secured by said mortgages" and other specified defaults involving a prior lien were cured within ten days, the "acceleration rights provided for in each of said eleven mortgages" would be exercised, plaintiff elected to accelerate and accordingly brought this suit to foreclose. Tender of the interest due on the $190,000 debt, made in open court on February 17, 1956, was refused, as coming too late.

The notice specified these defaults: (1) interest due January 2, 1956 "on the amount secured by said mortgages," and "each of said mortgages is therefore now in default"; (2) interest and installment of principal due December 1, 1955 to Farmer & Oehs Company on its prior mortgage lien, amounting to $11,352.84, and additional interest of $1,291.67 due January 1, 1956, and also an installment of $4,000 falling due January 1, 1956 on the principal of the latter mortgage. The defaults involving the prior mortgage set down in subdivision (2) of the notice were cured by payment within time, but not the default stated in subdivision (1).

Defendants contend that "No notice was given to the individual defendant as to default in payment of interest on his $190,000 debt, or specifying any default in the agreement of September 28, 1955"; that the default set forth in subdivision (2) "was completely cured," and "no interest

was due January 2, 1956 on the mortgage indebtedness, and there was no default as to item No. 1." This, on the hypothesis that "under the terms of the mortgage, as modified by the collateral agreement of even date, incorporated by reference, an interest payment due January 2, 1956 pursuant to the terms of the mortgage itself, had been deferred." A secondary question raised is whether the notice of January 12, 1956 constituted "due notice of default as to the interest payment on the $190,000 due January 2, 1956, pursuant to the terms of the agreement of September 28, 1955."

There was a summary judgment of dismissal in the Superior Court. Judge Stanton found that the mortgage and the agreement of September 28, 1955, read together, reveal an "intention" that "the payment of interest on the $400,000 mortgage should be deferred if the other obligations were met"; "There is no cancellation of that interest or no extinguishment of it, merely a deferment of it as long as the interest on the $190,000 was paid"; and "since no notice was given as to the default in the payment of the interest on the $190,000 obligation, there has been no acceleration."

The case is here by our certification of plaintiff's pending appeal to the Appellate Division.

. The corporate mortgage provides that "* * * the entire unpaid principal of this mortgage and all interest accrued thereon shall forthwith become due and payable upon the occurrence of any one or more of the following events: (a) Default in the performance of any term, provision or requirement of the aforementioned written agreement of even date herewith; (b) Default in the performance of the within mortgage or any other mortgage given to secure said principal sum of $400,000, or default in any lien prior to the within mortgage or any such other mortgage." There is also a provision for acceleration in the event of the insolvency of the corporation or a named affiliate corporation, or "if it go into reorganization under Chapter X or Chapter XI of the Bankruptcy Act," or "if it make a composition with its creditors," or in case of the sale of its assets, or if

any execution or attachment shall issue against any of its property or effects, and shall not be vacated or satisfied within five days from the date of issue, or if default is made in a payment required by the plan or arrangement (under Chapter XI) to the Class 1 creditors of the corporation; and then comes the clause that such "acceleration shall not be complete and enforceable unless ten days notice of the default complained of is sent by registered mail addressed to I. J. Krosnowski" at a given address, and "unless within ten days from the date of such mailing the default complained of is not completely cured and eliminated."

But the agreement of September 28, 1955 made sale of the Baltimore Group's corporate stock and creditor-claims to the individual defendant, representing the I. J. Group, for the sum of $225,000, the balance of $190,000 remaining after the cash payment to be paid "in consecutive weekly payments of $1,000 each on Monday of each week, the first of such payments to be made one week after the Class 1 creditors of Garford shall have received final payment of the moneys due them under the Plan of Reorganization approved in said Chapter XI Proceeding," and meanwhile interest thereon at 5%, payable quarter-annually, and at the same rate on unpaid balances after the weekly payments on principal shall have begun; and provision was therein made for the assignment of the I. J. Group's interest in the $400,000 mortgages and the capital stock of Garford and a subsidiary corporation as collateral security for the payment of the unpaid purchase price of $190,000, subject to this acceleration clause:

"Notwithstanding anything in the within agreement or in any other instrument to the contrary, the entire unpaid purchase price of $190,000, or the unpaid balance thereof, with all accrued interest thereon, shall forthwith become due and payable upon the occurrence of any one or more of the following events:

(a) Default in the performance of any term, provision or requirement of the within agreement.

(b) Default in any real estate mortgage given or assigned collaterally to secure the payment of said purchase price, or any default in any lien prior and paramount to any such mortgage."

And subdivision (c) included, as grounds for acceleration, the insolvency of either Garford or the subsidiary corporation, or the sale of its assets or seizure thereof by judicial process, in terms somewhat similar to the acceleration clause of the mortgage.

The acceleration clause of the agreement, paragraph 7, provides that "the right of acceleration shall not be complete and perfected unless and until notice shall have been mailed to" the individual defendant, at a given address, "of the event or default upon which acceleration is based," and stating the particular "default or event," and "if such default or event is not cured or eliminated within ten days after the date of mailing, then the said right of acceleration shall become complete and perfected," and plaintiff "or his assignee or nominee shall have the right forthwith to enforce all securities in his hands in any order or mode that he may elect, including the right forthwith to vacate the offices of directors and officers of Garford, Realty and White and elect others in their place, and to take possession of the assets and property of said companies."

Notice was not given of a default in the payment of the interest then due on the debt of $190,000, and an election to accelerate the maturity of that debt unless the particular interest default were cured within the allotted time, an express pre-condition under the Agreement to such right of acceleration. As we have seen, the notice given had reference only to the default in the payment of the "interest due January 2, 1956 on the amount secured by said mortgages," and the consequence that "each of said (11) mortgages is now in default," and the defaults involving the prior mortgage lien, and made known that unless the "defaults hereinabove complained of" were "completely cured and eliminated" within the stipulated ten-day period, the plaintiff would "avail himself of the acceleration rights provided for in each of said eleven mortgages."

And so plaintiff cannot prevail unless default in the payment of the installment of interest accruing on the same day on the $400,000 mortgage would entitle plaintiff

to accelerate the maturity of the collaterally-secured debt, even though there had been no default in the payment of interest on the $190,000 debt or, on the contrary hypothesis, as is the case here, without notice of such default and an election to accelerate the payment of that debt.

Indeed, plaintiff contends that the corporate mortgage "was enforceable according to its terms, whether or not there was also an acceleration of the debt owed by the defendant-mortgagee to the plaintiff, for which the mortgage was assigned as collateral security"; and *Howell v. Bartlett,* 124 *N. J. Eq.* 544 (*Ch.* 1939), modified 126 *N. J. Eq.* 315 (*E. & A.* 1939), and *Central National Bank of Cleveland, Trustee v. O'Brien (Mills), executor,* 62 *Ohio App.* 413, 24 *N. E. 2d* 607 (*App. Ct.* 1936), *certiorari* denied 311 *U. S.* 593, 61 *S. Ct.* 1114, 85 *L. Ed.* 1547 (1941), are cited for the proposition that the assignment of the mortgage "* * * as security for another debt, accomplished no alteration in the tenor of the corporate mortgagor's obligation," and the "fact that a debt, collaterally secured by the assignment of a mortgage, has not matured, is no obstacle to the pledgee's enforcement of a mortgage default."

But this principle of general application in other and different circumstances, designed to fulfill the common intention of the parties, as a measure essential to · the protection of the security, is not by the same token relevant where there is a reasonably discernible intention *contra,* relating the whole of the contractual expression to the situation and circumstances of the parties, or the manifestation of intention is vague or ambiguous, and there comes into play the rule that in its very nature an acceleration clause is construed *strictissimi juris.* To be enforceable, the option to accelerate must be clear and certain in its terms; it will not be supplied by mere inference; and, where found, it must be "strictly exercised according to its terms." *The Pennsylvania Company for Insurance on Lives and Granting Annuities v. Broadway-Stevens Co.,* 105 *N. J. Eq.* 494 (*Ch.* 1930), Leaming, V. C.

Defendants refer to paragraph 14 of the agreement providing that in consideration of Garford's "securing by mortgages and otherwise the ultimate payment of the indebtedness due to the persons constituting the parties of the second and third part, the latter do hereby waive their present and immediate right to compel Garford to pay them the said indebtedness," and they further agree "to forbear the enforcement of said indebtedness against Garford as long as the within agreement and all instruments given thereunder are carried out and no default occurs, even though such period of forbearance may extend for years"; and Garford, "on the other hand, hereby waives the defense of the statute of limitations in the ·event that such forbearance endures beyond the period within which the said indebtedness must be sued under the pertinent statute of limitations."

And the argument is that this provision, constituted an integral part of the contract by a "rider" affixed to the mortgage certifying that the mortgage was given "* * * pursuant to" the agreement, makes clear that "* * * the mortgage was to secure 'the ultimate payment' of the mortgage indebtedness"; that "Its assignment * * * was for the purpose of securing the ultimate payment of the $190,000 indebtedness of the individual defendant to the plaintiff," and "So long as all of the terms of the mortgage, excepting as to payment of interest, and all of the terms of the other prior mortgages of the corporate defendant on the same properties, and all of the terms of the agreement of September 28 were performed, payment of interest on the $400,000 indebtedness secured by the mortgage was to be deferred." "All taxes on the mortgaged properties, interest and amortization payments on prior liens, insurance premiums, etc.," it is conceded, "had to be paid by the mortgagors, so that the value of the $400,000 mortgage, collateral security for the payment of the $190,000 indebtedness, would not be impaired."

Plaintiff maintains, on the other hand, that paragraph 14 does not "override default and acceleration clauses" in the mortgage, and, at all events, the term "indebtedness" refers

to the "obligation which preceded the account stated, achieved by the agreement of September 28th" and it was "only the antecedent debt which the mortgagees could 'forbear,'" and "Consequent upon the agreement, the 'present and immediate right to compel Garford to pay them the said indebtedness' was extinguished"; that "Collection thereafter was limited to the obligation established by the agreement, *i. e.*, the mortgage debt of $400,000, dependent only upon the condition that 'the within agreement *and* all instruments given *thereunder* are carried out and *no default* occurs,'" and the "mortgage is undeniably one of the 'instruments' referred to in paragraph 14 of the agreement," and the "failure to pay mortgage interest is just as undeniably a *default* under that 'instrument'"; and that "in resisting foreclosure, the defendants contradict not merely the mortgage, but the agreement as well."

But plaintiff's interpretation gives the literal sense of particular terms, isolated from the context, ascendancy over the reason and spirit of the whole of the contract, expressed in the mortgage and the agreement, assessed in relation to the circumstances and the situation of the parties and the objects they were striving to attain. See *Mantell v. International Plastic Harmonica Corporation,* 141 *N. J. Eq.* 379 (*E. & A.* 1947) ; *Atlantic Northern Airlines, Inc. v. Schwimmer,* 12 *N. J.* 293 (1953).

The overall intent and purpose, according to the agreement of September 28, 1955, was the effectuation of an amended plan or arrangement adopted on the day of the date of the agreement, dividing the creditors of Garford into two classes, *viz*: Class 1, comprising the "general unsecured creditors," and Class 2, creditors within the Krosnowski family, designated as the "I. J. Group" and the "Baltimore Group," and thereby terminating "Proceedings for an Arrangement under Chapter XI of the Bankruptcy Act," whereby the "business, assets and affairs" of Garford had been under the jurisdiction of the United States District Court for the District of New Jersey and the "control and management of a receiver appointed" by the court.

In respect of the $190,000 debt, the plaintiff's Baltimore Group was entitled only to the stipulated interest on that sum; in this regard, it had no claim to the interest payable on the $400,000 mortgage debt, unless the interest so provided would constitute a fund for the later payments on the principal itself, after the Class 1 creditors of Garford had "received final payment of the moneys due them under the Plan of Reorganization approved in said Chapter XI proceeding"; and there is no provision in the agreement to that end. Thus, the nonpayment of interest on the mortgage debt itself could not diminish or impair the integrity of the mortgage as security for the debt owing to plaintiff; and, such being the case, there is no conceivable contractual reason for bringing this default within the operative acceleration clause of the agreement bearing upon the $190,000 debt. It is not to be supposed, from what has been written, that the parties intended that a default in the payment of interest on the mortgage debt of $400,000 would forthwith terminate the venture and defeat a plan primarily designed to protect the general creditors of the corporation and salvage the interest of the family in the enterprise, certainly not at the instance of the plaintiff assignee, for an interest default on the $190,000 debt. This is not the conventional assignment to one not otherwise a party to the transaction eventuating in the mortgage and the agreement. All this would seem to be clear enough when the contractual scheme is related to the attendant circumstances; and such is the primary purpose of interpretation.

Interpretation is the process of giving meaning to the symbols of expression used by another. It is not the judicial interpretive province to give effect to some supposed unexpressed intention of the parties. The courts do not make contracts for the parties. *Temple v. Clinton Trust Co.,* 1 *N. J.* 219 (1948). But the surrounding circumstances may make a "meaning plain and clear when in the absence of such proof some other meaning may also have seemed plain and clear." *Corbin on Contracts, section* 542. Mere speculation as to the probabilities of an intention is not

enough; the evidence must be such "as can lead a reasonable man to a distinct conclusion." *Re Jodrell,* 44 *Ch. D.* 590 (1890), Bowen, L. J. The construction of a written instrument "to be adopted is the one which appears to be in accord with justice and common sense and the probable intention of the parties. It is to be interpreted as a business transaction entered into by practical men to accomplish an honest and straightforward end." *Clark v. State St. Trust Co.,* 270 *Mass.* 140, 169 *N. E.* 897 (*Sup. Jud. Ct.* 1930). See *Bird v. St. Paul Fire & Marine Insurance Co.,* 224 *N. Y.* 47, 120 *N. E.* 86, 13 *A. L. R.* 875 (*App. Ct.* 1918), Cardozo, J. A subsidiary provision should be "so interpreted as not to be in conflict with what clearly appears to be the 'dominant purpose' of the contract"; where the "principal purpose" of the parties is fairly discernible, "further interpretation of the words of the contract should be such as to attain that purpose, if reasonably possible"; "The meaning thus adopted is likely to be the meaning that the parties had"; "This often properly leads to a conviction that the parties have used a particular word or phrase in an unusual sense." *Corbin, Ibid., sections* 545, 547. See *Bullowa v. Thermoid Company,* 114 *N. J. L.* 205 (*E. & A.* 1935). "Repugnant words may be rejected in favor of a construction which makes effectual the evident purpose of the entire instrument." *Morrill & Whiton Construction Co. v. City of Boston,* 186 *Mass.* 217, 71 *N. E.* 550 (*Sup. Jud. Ct.* 1904).

The general design is to be kept in view in ascertaining the sense of particular terms. *Washington Construction Co., Inc., v. Spinella,* 8 *N. J.* 212 (1951); *Casriel v. King,* 2 *N. J.* 45 (1949). "Greater regard is to be had to the clear intent of the parties than to any particular words which they may have used in the expression of their intent. A contract must be construed as a whole and the intention of the parties is to be collected from the entire instrument and not from detached portions. Individual clauses and particular words must be considered in connection with the rest of the agreement, and all parts of the writing and every word of it, will, if possible, be given effect"; the words are to

be given a "reasonable meaning rather than an unreasonable one and a court will endeavor to give a construction most equitable to the parties and which will not give one of them an unfair or unreasonable advantage over the other." 9 *Williston on Contracts* (*rev. ed.* 1945), *section* 46. Undue hardship and undue advantage are elements to be considered where the words are susceptible of different meanings. When it becomes clear that a "certain factual result" was within the contemplation of the parties, "interpretation should be affected by reasonable and necessary implications, so that the legal effect then given to the instrument will be such as to attain the intended factual result"; a court may thus, without the necessity of a formal reformation, "be able to realize the aims and purposes of the parties, even though their express words would otherwise be interpreted differently and would produce a different legal effect." *Corbin, Ibid., section* 545.

So read, the writings here leave no abiding reasonable doubt of the intent and purpose. Only by the interpretation thus given the instruments as an entirety may the rights and equities of the parties, as they themselves intended, be fulfilled.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER and JACOBS—3.

*For reversal*—Justices WACHENFELD and BURLING—2.