**SCHERING CORPORATION, Plaintiff,**

**Roussel-Uclaf SA, Joined As Involuntary Plaintiff,**

**v.**

**ZENECA INC. and Zeneca Holdings, Inc., Defendants.**

**Civil Action No. 95–566–RRM.**

United States District Court, D. Delaware.

Feb. 20, 1996.

Steven Balick, and Amy Quinlan, Ashby and Geddes, Wilmington, DE; Gregory L. Diskant, Jeffrey I.D. Lewis, Michael J. Timmons, Robert Lehrburger, and Jennifer Pariser, Patterson, Belknap, Webb and Tyler LLP, New York City; Robert J. Trainor, James R. Nelson, Thomas D. Hoffman, and Jane G. Wasman, Schering Corporation, Kenilworth, NJ, for Plaintiff Schering Corporation.

Arthur G. Connolly, Jr., and Gerard M. O'Rourke, Connolly, Bove, Lodge and Hutz, Wilmington, DE; James F. Lesniak, Joseph R. Re, and Joseph R. Jennings, Knobbe, Martens, Olson and Bear, Newport Beach, CA, for Involuntary Plaintiff Roussel–Uclaf SA.

Jack B. Blumenfeld, and Mary B. Graham, Morris, Nichols, Arsht and Tunnell, Wilmington, DE; E. Anthony Figg, Steven Lieberman, Bart G. Newland, Joseph A. Hynds, Jeffrey B. McIntyre, and Mark I. Bowditch, Rothwell, Figg, Ernst and Kurz, Washington, DC; Arthur F. Cohen, and Joel M. Cohen, Davis, Polk and Wardwell, New York City; William C. Lucas, and Laura Davies, Zeneca, Inc., Wilmington, DE, for Defendants Zeneca Inc. and Zeneca Holdings Inc.

## OPINION

McKELVIE, District Judge.

This is a patent case. Plaintiff Schering Corporation ("Schering") and involuntary plaintiff Roussel–Uclaf SA ("Roussel") are the co-owners of U.S. Patent No. 4,472,382 (the " '382 Patent"). The '382 patent claims a method of treating prostate cancer and benign prostatic hypertrophy, which is a benign enlargement of the prostate common in men over 50 years of age. The claimed method involves applying two therapies at the same time—introducing chemicals, known as antiandrogens, into the body to neutralize the effect of certain male hormones, known as androgens, while introducing other chemicals into the body to inhibit the production of androgens. This method of treatment is known as "combination therapy."

On September 19, 1995, Schering filed a complaint against Zeneca Inc. and Zeneca Holdings Inc. (collectively "Zeneca"), alleging that Zeneca's manufacture, marketing, and sale of bicalutamide, an antiandrogen, for use in combination therapy infringes the claims of the '382 patent. Schering joined Roussel as an involuntary plaintiff pursuant to Rule 19(a) of the Federal Rules of Civil Procedure ("FRCP").

On October 23, 1995, Zeneca filed an answer in which it denied infringement and counterclaimed for a declaratory judgment that the '382 patent is invalid, unenforceable, and not infringed. Zeneca also asserted a Sherman Act antitrust counterclaim against Schering. On November 1, 1995, Zeneca amended its answer to include the affirmative defense that it had a license from Roussel to manufacture and sell bicalutamide for use in combination therapy.

On November 6, 1995, Zeneca filed a motion for summary judgment of non-infringement based on the license that Roussel granted to Zeneca. Roussel filed a brief joining Zeneca's motion for summary judgment. On November 20, 1995, the court held a hearing on Zeneca's motion. After the hearing, Schering filed a cross-motion for summary judgment on Zeneca's license defense. This is the court's decision on both Zeneca's and Schering's motions for summary judgment.

## I. FACTUAL BACKGROUND

The parties have completed briefing for both Schering's and Zeneca's motions for summary judgment. In addition, the parties have briefed a motion by Schering for a preliminary injunction against Zeneca, and the court held a hearing on Schering's motion for a preliminary injunction on January 5, 8, and 9, 1996. The court draws the following factual summary from the complaint and counterclaims, the briefs for all three motions, and the November and January hearings.

### A. The Physiology and Treatment of Prostate Cancer

Scientists have discovered that certain male hormones, known as androgens, are linked to the development and growth of prostate cancer. The most common androgen is testosterone. Testosterone is produced as the result of a complex chain of chemical reactions in the body. A portion of the brain, known as the hypothalamus, monitors the level of testosterone in the body. When the hypothalamus perceives a shortage of testosterone, it releases what is known as luteinizing-hormone release hormone ("LHRH"). LHRH signals the pituitary gland to produce luteinizing hormone ("LH"), and LH then signals the testes to produce testosterone. The adrenal glands also produce precursor androgens, which metabolize into androgens in the tissue cells of the prostate. Testosterone and androgens from the adrenal glands feed healthy prostate cells, but they also help prostate cancer cells to grow.

### 1. Treatments Before the '382 Patent

Based on the linkage between androgens and prostate cancer, scientists have developed a number of medical treatments. The earliest treatments involved either castration or the administration of a female hormone, known as estrogen. Both of these treatments lower the level of testosterone circulating in the blood. However, neither treatment cures prostate cancer, and both are flawed. The administration of estrogen can cause blood clots and serious cardiovascular risks. Castration is nonreversible and undesirable for many sociological and psychological reasons.

In response to the problems of these earlier treatments, scientists developed newer treatments. One treatment involves introducing antiandrogens to neutralize the effect of androgens in the body. Antiandrogens are chemicals that bind to androgen receptors on prostate cells, thus preventing androgens from binding to those receptor sites. Another treatment involves introducing LHRH into the body to reduce the number of androgens. When LHRH is administered in large doses, it first causes the testes to produce more testosterone. However, the constant bombardment of LHRH eventually causes the hypothalamus to believe that the body does not need testosterone. Thus, the administration of large doses of LHRH effectively results in chemical castration. LHRH is available in a synthetic form, which is known as an "LHRH agonist" or "LHRH analog."

Unfortunately, these treatments have not been much more successful than the earlier treatments. Introducing antiandrogens into the body, and thereby blocking androgen receptors, leads the hypothalamus to conclude that the body is not producing enough androgens. Consequently, the hypothalamus increases the production of testosterone to make up for the perceived shortage. This is known as the "escape" or "feedback" problem. Introducing LHRH or an LHRH agonist into the body temporarily stimulates the hypothalamus to overproduce testosterone in dangerous amounts. This is known as the "flare" problem. In addition, LHRH and

LHRH agonists do not stop the production of precursor androgens by the adrenal glands.

### 2. *Combination therapy and the '382 Patent*

Two scientists, Fernand Labrie and Jean-Pierre Raynaud, sought to develop a treatment for prostate cancer that avoided the problems of existing treatments. Labrie and Raynaud decided to combine the use of an antiandrogen with the use of an LHRH agonist. They anticipated that the antiandrogens would shield androgen receptors from the flare problem caused by an LHRH agonist and from precursor androgens still produced by the adrenal glands. In addition, they anticipated that an LHRH agonist would eliminate the feedback problem caused by antiandrogens by stopping the production of testosterone.

Based on their success with this combination therapy, Labrie and Raynaud applied for and received the '382 patent. The '382 patent claims a method of combining the administration of an antiandrogen to neutralize androgens in the body with the administration of an LHRH agonist to reduce the amount of testosterone in the body. Labrie assigned his rights under the '382 patent in the United States to Schering. Raynaud assigned his rights under the '382 patent in the United States to Roussel.

### B. *The Facts Underlying the Present Litigation*

Zeneca markets bicalutamide, an antiandrogen, for use in combination therapy. Zeneca sells bicalutamide under the registered trademark Casodex®. Schering alleges that Zeneca's marketing of Casodex® infringes the '382 patent. Zeneca claims that it has a license from Roussel to market Casodex®. Schering responds that Roussel did not have the ability to grant a license to Zeneca based on Schering's Co-Ownership Agreement with Roussel. An evaluation of these arguments requires a summary of the negotiation of the Co-Ownership Agreement and the events that have occurred since between Schering, Roussel, and Zeneca.

### 1. *Schering and Roussel negotiate the Co-Ownership Agreement*

Sometime in 1988, a dispute developed between Labrie, Roussel, and Schering as to whether Labrie improperly assigned his rights under the '382 patent in the United States to Schering. In December of 1989, Schering, Roussel, and Labrie settled this dispute by entering into three separate agreements, only one of which is relevant here. Schering and Roussel executed the relevant agreement, which is referred to as the "Co-Ownership Agreement."

Paragraph 1 of the Co-Ownership Agreement recognizes that Schering and Roussel are co-owners of the '382 patent and guarantees each company the right to market their respective antiandrogens in the United States. Paragraphs 2, 3, and 4 establish the rights, responsibilities, and division of costs with respect to the maintenance and prosecution of the '382 patent and other patents co-owned by the parties. Paragraph 5 establishes the rights, responsibilities, and division of costs with respect to bringing infringement actions against third parties.

The language of Paragraph 5 of the Co-Ownership Agreement is relevant to the present lawsuit. Paragraph 5 states:

Upon the discovery by any party of any **infringement** of [the '382 patent], such party shall notify the other diligently: if the parties agree to do so, appropriate legal action in connection therewith shall be undertaken by the parties jointly. In the event that such action is taken, each party shall contribute equally to the expenses of any such action. If any damages for infringement are awarded by a final decree or judgment, then after deducting all expenses arising from the litigation and reimbursing each party for its contributions, the remainder shall be divided equally among the contributing parties. If one party shall not wish to join or continue in any such action, but the other party shall wish to institute or continue such action, said one party shall render all **reasonable assistance** to said other party in connection therewith at said other party's expense and said other party shall be enti-

tled to retain all recoveries obtained with respect to such action. (emphasis added)

A Roussel attorney submitted the first draft of this paragraph, which he based on Form 30.16 of Nordhaus, *Patent License Agreements* § 30–16 (1979). The parties made minor changes to Form 30.16 and incorporated it into the Co–Ownership Agreement as Paragraph 5. They spent only a brief amount of time discussing Paragraph 5. They did not discuss the topic of licensing at any time during the negotiation, nor did they discuss the meaning of the terms "infringement" or "reasonable assistance."

### 2. *Zeneca seeks a license from Roussel and Schering seeks exclusive rights under the '382 patent*

Soon after Schering and Roussel signed the Co–Ownership Agreement, Schering began to market its antiandrogen, flutamide, in the United States under the registered trademark Eulexin®. At the same time, Roussel was attempting to find a licensee to market its antiandrogen, nilutamide, in the United States. Roussel had marketed nilutamide in France as early as 1987, but Roussel's United States marketing partner was not interested in marketing the product.

On July 22, 1994, Dr. Robert Nolan, a Zeneca licensing manager, called Gerard Kannengiesser, a Roussel employee, concerning the possibility of having Roussel grant a license to Zeneca under the '382 patent. Apparently, Zeneca was in the process of developing Casodex® at this time. On October 6, 1994, John Mack, a Zeneca patent attorney, met with Jean–Claude Vieillefosse, a Roussel representative, at Roussel's Romainville, France offices. At this meeting, Zeneca again discussed the possibility of obtaining a license from Roussel.

About one month after Nolan first called Kannengiesser at Roussel, Karin Gast, a Senior Director of Business for Schering, contacted Kannengiesser about the possibility of obtaining exclusive rights under the '382 patent. Schering knew that Zeneca was developing Casodex® at this time. Apparently, Schering sought to prevent Zeneca from being able to obtain a license from Roussel.

The license negotiations between Zeneca and Roussel continued. On January 10, 1995, Nolan and Mack, along with another Zeneca employee, met with Roussel employees at Roussel's Paris offices to discuss the license. On March 29, 1995, Kannengiesser telephoned Gast and told her that Roussel would not be willing to grant Schering exclusive rights to the '382 patent. In early April of 1995, Kannengiesser contacted Zeneca representatives and told them that Roussel was willing to grant a license to Zeneca under the '382 patent.

### 3. *Schering notifies Roussel that Zeneca's marketing of Casodex® for use in combination therapy may infringe the '382 Patent*

In May of 1995, Zeneca published an article in *The Journal of Urology* on its principal clinical trial of Casodex® for use in combination therapy. This report was entitled "A Controlled Use of Bicalutamide [Casodex®] Versus Flutamide [Eulexin®], Each in Combination With Luteinizing Hormone–Releasing Hormone [LHRH] Analogue Therapy, In Patients With Advanced Prostate Cancer," referred to here as the "Schellhammer Study." About the same time that the Schellhammer Study was published, Zeneca began promoting Casodex® in advertisements and at trade shows. One of these advertisements states: "Coming soon—your chance to choose a new direction—Casodex®—bicalutamide." Zeneca also presented some of the results of the Schellhammer Study to physicians and other health professionals at The American Urologic Association meeting in Las Vegas, Nevada, during April of 1995, and to members of the American Society for Clinical Oncology in Los Angeles, California, during May of 1995.

On May 22, 1995, Schering sent a letter to Roussel stating in relevant part that:

Further to the [Co–Ownership] Agreement between Roussel–Uclaf SA and Schering Corp., . . . please be advised that there are published reports that Zeneca Inc. and/or Zeneca Holdings Inc. is in the process of obtaining approval from the United States Food & Drug Administration for an antiandrogen, CASODEX, to be used in association with LH–RH agon-

ists.... We believe that the use of CA-SODEX proposed by Zeneca will infringe the claims of the '382 patent when approved by the FDA.

This letter is to advise you of the **potential infringement** and to seek your agreement under Paragraph 5 [of the Co–Ownership Agreement] to undertake legal action jointly with Schering Corporation against Zeneca as soon as the approval is imminent.... [I]f you decide not to join us, we expect and understand pursuant to Paragraph 5 that Roussel–Uclaf will render all **reasonable assistance** to Schering Corporation. (emphasis added).

Roussel did not respond to Schering's May 22, 1995 letter. In August of 1995, Thomas Hoffman, a Schering attorney, telephoned Roussel employee Vieillefosse concerning Roussel's response to the letter. Vieillefosse told Hoffman that Roussel had not decided how it would respond to the letter.

### 4. *Schering sues Zeneca and Roussel Grants a License to Zeneca*

On September 14, 1995, Zeneca and Roussel representatives met in Paris to continue their negotiations about the possibility of obtaining a license agreement under the '382 patent. At the conclusion of these negotiations on September 15, 1995, Roussel and Zeneca had reached an agreement, at least in principle, on many of the basic terms of the license.

On September 19, 1995, at approximately 5:00 a.m. EST, several of Schering's attorneys telephoned Vieillefosse and another Roussel employee seeking Roussel's cooperation in a possible lawsuit against Zeneca. Apparently, Vieillefosse told the Schering attorneys that Roussel was "in the midst of [license] negotiations" with Zeneca. Later that afternoon, Schering filed this infringement action against Zeneca and joined Roussel as an involuntary plaintiff. Schering also sent a letter via facsimile to Roussel that same day stating that it had filed an infringement action against Zeneca. The letter purports to give notice under Paragraph 5 of the Co–Ownership Agreement of Zeneca's "actual infringement" and seeks "reasonable assistance" from Roussel.

On October 4, 1995, the FDA approved Zeneca's product Casodex® for use in combination therapy. That same day, Zeneca signed a license agreement with Roussel that provides among other things:

[Roussel] hereby grants to ZENECA a non-exclusive license under the ['382 patent] to manufacture, import, use, sell and offer for sale Bicalutamide [Casodexdex®] in any country in which [the patent] is effective for any use which, if unlicensed, could otherwise amount to an infringement of [the patent], and, with respect to any such use, the non-exclusive license shall extend to third parties who purchase, prescribe or use Bicalutamide [Casodex®] from ZENECA or from authorized third parties/dealers.

Roussel signed the agreement on October 5, 1995. Zeneca began selling Casodex® for use in combination therapy on October 18, 1995.

## II. *DISCUSSION*

Schering argues that Roussel did not have the power to grant a license to Zeneca, and thus the court must grant summary judgment for Schering on Zeneca's license defense. Schering argues that proper notice of "infringement" under Paragraph 5 of the Co–Ownership Agreement includes notice of potential or future infringement. Thus, both the May 22, 1995 and September 19, 1995 letters triggered Roussel's obligation to provide "reasonable assistance" under Paragraph 5 even though Zeneca had not performed any allegedly infringing act as of September 19, 1995. Schering further argues that Roussel's duty to provide "reasonable assistance" means that Roussel cannot perform any act that would thwart or interfere with Schering's lawsuit against Zeneca. Thus, Roussel did not have the ability to grant a license to Zeneca after the May 22, 1995 and September 19, 1995 letters.

Zeneca and Roussel argue that Roussel did have the ability to grant a license to Zeneca, and thus the court must grant summary judgment of noninfringement based on Zeneca's license from Roussel. They argue that Roussel's obligation to provide "reasonable assistance" under Paragraph 5 of the Co–

Ownership Agreement only requires Roussel to provide litigation support to Schering, such as producing witnesses and documents for Schering's convenience. Thus, Paragraph 5 does not prohibit Roussel from granting a license after notice of "infringement." Zeneca and Roussel also argue that proper notice of "infringement" under Paragraph 5 cannot occur until a third party has committed an act of infringement. Thus, the May 22, 1995 and September 19, 1995 letters did not trigger Roussel's obligation to provide "reasonable assistance" to Schering.

### A. Is Summary Judgment Appropriate at This Stage of the Litigation?

■ A court may grant summary judgment only if it finds "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 340–41 (3d Cir. 1990). When parties to a contract dispute the meaning of terms in the contract, a court must first determine whether the terms are clear or ambiguous. *See. e.g., Pennbarr Corp. v. Insurance Company of North America*, 976 F.2d 145, 149 (3d Cir.1992). If the terms of the contract are clear, then the court can "construe" the terms as a matter of law. *See, e.g., Cooper Laboratories, Inc. v. International Surplus Lines Insurance Co.*, 802 F.2d 667, 671 (3d Cir.1986). If the terms of the contract are ambiguous, then the appropriate fact finder must "interpret" the contract. *Id.*

The parties do not dispute the material facts in this case. The parties agree that Paragraph 5 of the Co–Ownership Agreement does not restrict the ability of Schering or Roussel to license the '382 patent absent proper notice of "infringement." Furthermore, the parties agree that Schering and Roussel did not discuss the topic of licensing while negotiating the Co–Ownership Agreement, nor did they discuss the meaning of the terms "reasonable assistance" or "infringement" in Paragraph 5. Finally, the parties agree that Roussel purportedly granted a license to Zeneca on October 4, 1995, and that Zeneca did not perform any allegedly infringing act before that date.

The parties only dispute the legal effect of the terms "reasonable assistance" and "in-

fringement" in Paragraph 5 of the Co–Ownership Agreement. The parties argue, and the court agrees, that these terms are not ambiguous. Rather, the parties argue that the court must construe these terms as a matter of law by "filling gaps ... about matters that the parties had not contemplated." *Cooper Laboratories*, 802 F.2d at 671 (quoting 3 *A. Corbin on Contracts* § 534, at 9 (1960)). Therefore, the court can resolve on summary judgment the issue of whether Roussel had the ability to grant a license to Zeneca. *See id.*

### B. Did Roussel Have the Ability to Grant a License to Zeneca?

To determine whether Roussel had the ability to grant a license to Zeneca, the court must construe the terms "reasonable assistance" and "infringement" in Paragraph 5 of the Co–Ownership Agreement. The Co–Ownership Agreement does not have a choice-of-law clause. Thus, the court first must determine which state's law to apply in construing the terms of the agreement. The court then must apply the appropriate state's law.

#### 1. Which state's law applies to the Co–Ownership Agreement?

■ The court must follow Delaware's choice-of-law rules to determine which state's substantive law to apply in the construction of the Co–Ownership Agreement. *See Shuder v. McDonald's Corporation*, 859 F.2d 266, 269 (3d Cir.1988). Delaware law requires courts to determine which state has the "most significant relationship" to the contract at issue and to the parties to the contract. *Essick v. Barksdale*, 882 F.Supp. 365, 369 (D.Del.1995); *Playtex Family Products, Inc. v. St. Paul Surplus Lines Insurance Co.*, 564 A.2d 681, 688 (Del.Super.Ct.1989); *Restatement (Second) of Conflict of Laws* § 188. In determining which state has the most significant relationship, Delaware courts consider the place of contracting, the place of negotiation of the contract, the place of performance, the location and subject matter of the contract, and the residence of the contracting parties. *Essick*, 882 F.Supp. at 369.

■ Schering is a New Jersey Corporation, with its principal place of business in

New Jersey. The Co–Ownership Agreement was prepared by Schering in New Jersey and by Roussel in France. It appears that it was signed by Schering in New Jersey and by Roussel in France. Zeneca has argued that New Jersey law applies, and both Schering and Roussel appear to agree. Based on the above, the court finds that it should apply the principles of contract construction set out by the New Jersey courts in order to construe the Co–Ownership Agreement.

2. *What does "reasonable assistance" mean according to New Jersey principles of contract construction?*

■ Under New Jersey law, a court construing the terms in a contract primarily should seek to determine the intent of the parties as expressed in the contract. *J.I. Hass Co.. Inc. v. Gilbane Bldg. Co.*, 881 F.2d 89, 92 (3d Cir.1989), *cert, denied,* 493 U.S. 1080, 110 S.Ct. 1135, 107 L.Ed.2d 1040 (1990). In doing so, the court should analyze specific terms "with regard to the meaning of the contract as a whole." *Kaufman v. Provident Life and Casualty Insurance Co.,* 828 F.Supp. 275, 283 (D.N.J.1992), *aff'd.* 993 F.2d 877 (3d Cir.1993). The court also should consider the "role of common sense" by construing the contract as a "a business transaction entered into by practical [people] to accomplish an honest and straightforward end." *Armco Inc. v. Glenfed Financial Corporation,* 746 F.Supp. 1249, 1253 (D.N.J. 1990) (quoting *Krosnowski v. Krosnowski,* 22 N.J. 376, 126 A.2d 182 (1956)).

■ No language in the Co–Ownership Agreement explicitly restricts Schering's or Roussel's right to license the '382 patent after notice of "infringement." Paragraph 1 of the agreement acknowledges Schering and Roussel's co-ownership of the '382 patent, which implicitly recognizes both parties' right to license the '382 patent. *See Talbot v. Quaker–State Oil Refining Co.,* 104 F.2d 967, 967–68 (3d Cir.1939) (stating that, absent an agreement to the contrary, a co-owner of a patent can license the patent without the consent of the other co-owner); *see also Willingham v. Lawton,* 555 F.2d 1340, 1344 (6th Cir.1977). Paragraphs 2, 3, and 4 merely establish the rights, responsibilities, and division of costs with respect to the mainte-

nance and prosecution of the '382 patent. Paragraph 5 establishes the rights and responsibilities with respect to enforcing the '382 patent, but no part of Paragraph 5 explicitly mentions licensing or any restriction on licensing.

If the parties had intended to restrict licensing after notice of "infringement" under Paragraph 5, they could have drafted an explicit provision doing so. In fact, at least one legal practice manual existing at the time of the negotiation of the Co–Ownership Agreement specifically advised co-owners of a patent to draft an explicit agreement regarding the licensing of the patent. *See* 4 *West's Federal Practice Manual* § 3935, at 32 (2d ed. rev.1989) ("Co-owners of patent rights normally should protect their interests by appropriate agreement as to the licensing and use of the patented invention and the sharing of proceeds received therefrom."). Instead, the parties adopted a patent enforcement clause from a manual on patent licensing agreements, rather than patent co-ownership agreements, without discussing the clause or considering the meaning of the language contained therein.

Having failed to include in the Co–Ownership Agreement an explicit provision regarding the licensing of the '382 patent, Schering now seeks to impose a construction of the term "reasonable assistance" that implicitly restricts Roussel's ability to interfere in any way with Schering's lawsuit against Zeneca, including licensing the patent to Zeneca after notice of "infringement." Roussel and Zeneca respond that Roussel's duty to render "reasonable assistance" only requires Roussel to provide litigation support to Schering and does not restrict Roussel's ability to license the patent.

The surrounding language of Paragraph 5 comports more closely with Roussel's proposed construction of the term "reasonable assistance." Paragraph 5 requires Roussel to "render all reasonable assistance to [Schering] in connection [Schering's lawsuit] *at [Schering's] expense* " (emphasis added). This underlined language suggests that "reasonable assistance" includes activities that are readily quantifiable and reasonably compensable. Thus, "reasonable assistance" more likely refers to providing litigation support to Schering, such as searching for and

204

producing documents and witnesses and making Roussel employees available for interviews, depositions, or trial testimony. Those activities result in reasonable and readily quantifiable expenses for which Schering can reimburse Roussel. It is unlikely the parties intended for Schering to reimburse Roussel for bypassing an opportunity to license the '382 patent. Moreover, the parties cannot quantify readily the opportunity cost of forgoing a licensing opportunity.

The "litigation support" construction of the term "reasonable assistance" also comports more with common sense given Roussel's practical business needs. At the time of the negotiation of the Co–Ownership Agreement, Roussel had not received United States Food and Drug Administration ("FDA") approval for nilutamide, its own antiandrogen. In addition, Roussel's United States affiliate had already declined to market nilutamide. Thus, Roussel could receive pecuniary gain from the patent only through licensing, at least until it received FDA approval for nilutamide and established a U.S. marketing channel. Under these circumstances, it is unlikely that Roussel would have agreed to give Schering veto power over Roussel's right to license the patent. Thus, under New Jersey principles of contract construction, the duty to render "reasonable assistance" does not restrict Roussel from granting a license to Zeneca after notice of "infringement."

### 3. Does federal law mandate a different conclusion?

█ Schering argues that *Willingham* mandates the conclusion that Roussel's duty to render "reasonable assistance" restricts Roussel from granting a license to Zeneca after notice of "infringement." In *Willingham,* a co-owner of a patent, John R. Willingham, sought to bring an infringement action without the voluntary joinder of the other co-owner, Star Cutter Company ("Star"). Willingham made Star an involuntary plaintiff pursuant to FRCP 19(a) and an agreement between Willingham and Star that allowed either party to bring an infringement action "in his or its sole discretion." *Id.* at 1342. The Court of Appeals for the Sixth Circuit held that Willingham properly joined Star as

an involuntary plaintiff under FRCP 19(a) and could maintain an action for infringement. *Id.* at 1346. In so holding, the court stated that under the agreement with Willingham, Star had waived its right to protest the adverse consequences of joining a lawsuit by Willingham, including the possibility that Willingham might file a "harassing suit" against one of Star's licensees. *Id.* at 1344.

*Willingham* does not mandate the conclusion that Paragraph 5 restricts Roussel's ability to grant a license after proper notice of "infringement." *Willingham* only dealt with the issue of whether a co-owner of a patent, pursuant to an agreement allowing it to bring an infringement action without the consent of the other co-owner, could join that co-owner as an involuntary plaintiff pursuant to FRCP 19(a). The court in *Willingham* did not address the issue of whether such an agreement prevents one of the co-owners from granting a license to an alleged infringer. In fact, the court specifically stated that co-owners have an absolute right to grant a license under the patent, absent an agreement to the contrary. *Id.* Moreover, a separate provision of the agreement between Star and Willingham specifically regulated Star's ability to license the patent.

The court's statement that Star waived its right to prevent Willingham from filing a "harassing suit" against one of Star's licensees does not suggest necessarily that Star somehow lost its ability to license the patent under its agreement with Willingham. This statement just as likely suggests that Star retained its ability to license in spite of the agreement. A lawsuit is "harassing" only when it is devoid of merit, as is the case when the defendant has a license under the patent. Thus, the court will not read *Willingham* as creating a mandatory rule of contract construction causing a co-owner to forfeit its right to license whenever that co-owner waives its right to resist joinder as an involuntary plaintiff under FRCP 19(a).

Because Roussel's duty to render "reasonable assistance" does not prevent Roussel from granting a license to Zeneca or any third party, the court need not construe the term "infringement" in Paragraph 5 of the Co–Ownership Agreement to determine whether Schering's May 22, 1995 and September 19, 1995 letters constituted proper

notice of "infringement" such as to invoke Roussel's duty to render "reasonable assistance."

■ For the reasons set out above, Roussel granted a valid license to Zeneca. Because Zeneca did not perform any allegedly infringing acts before Roussel granted the license, Zeneca's license provides an absolute immunity from Schering's infringement action. *See DeForest Radio Telephone and Telegraph Company v. United States,* 273 U.S. 236, 241, 47 S.Ct. 366, 367, 71 L.Ed. 625 (1927). Thus, the court will grant summary judgment of noninfringement of the '382 patent based on Zeneca's third affirmative defense that Roussel granted a license to Zeneca to market Casodex® brand bicalutamide for use in combination therapy.

The court will issue an Order in accordance with this Opinion.