295 N.J. Super. 445 (1996)
685 A.2d 481
STANLEY SCHENCK, PLAINTIFF-APPELLANT,
v.
HJI ASSOCIATES, HARRY BAILEY, AND JOSEPH BAILEY, DEFENDANTS-RESPONDENTS, AND IRA KUKAFKA, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued November 14, 1996.
Decided November 25, 1996.
*446 Before Judges SHEBELL, BAIME and BRAITHWAITE.
Daniel Louis Grossman argued the cause for appellant.
James M. Siciliano argued the cause for respondents, Bailey.
The opinion of the court was delivered by SHEBELL, P.J.A.D.
Plaintiff, a real estate broker, is aggrieved by an adverse decision from an umpire appointed under the Alternative Dispute Resolution Act (ADRA), N.J.S.A. 2A:23A-1 to 19. Following the umpire's decision, plaintiff moved in the Chancery Division to vacate the dismissal of his Complaint. However, following argument, the Chancery judge affirmed the umpire by order of November 9, 1995.
Plaintiff appeals and argues: "The trial court erred by upholding the umpire's failure to give effect to the contract's terms by *447 adverting to parol evidence where such an analysis was unnecessary." Plaintiff urges that an appellate court has authority to correct an ADRA umpire's legal error, and that the umpire and judge erred in finding that the provisions of the commission agreement were not triggered.
Plaintiff is licensed in New York and New Jersey. The individual defendants are partners at HJI Associates, a partnership whose sole asset was a 9.5 acre parcel of vacant land on the northeast corner of Route 35 and Industrial Way East, Eatontown. HJI purchased the property in 1986 with mortgage financing from Midlantic National Bank. By 1989, the mortgage had become seriously in default and its value had dropped to the point where the mortgage exceeded the fair market value of the property.
In 1992, the partnership listed the property for sale with Michael Gilman, a realtor. Shortly thereafter, Gilman notified the defendants that plaintiff, Stanley Schenck, said he had found possible tenants for the site, including a national entertainment company, AMC. AMC was interested in building a movie theater complex on the site. A Bally's Jack LaLanne health spa was also envisioned. At this time, the partnership was in default of the mortgage and foreclosure proceedings had been started.
Gilman and the defendants met several times with the plaintiff to discuss construction of a building on the site to house the prospective tenants. During these meetings, defendants informed the realtors that the mortgage was in default and being foreclosed, and that there was no equity left in the property. The value of the property in 1992 had dropped to between $600,000 and $800,000 and the mortgage balance had grown to about $1,800,000. Defendants also told the realtors that they could not pay any commission unless they obtained financing, with payments dependent upon construction draws and the paying of rent.
After much negotiating, a contingent lease was prepared and executed with AMC. It required certain municipal board approvals for the construction of the building which would house the movie theaters as well as contingencies for construction financing needed *448 by defendants. AMC was also aware of defendant's financial situation and that they needed to obtain financing.
Plaintiff sought to insure that he would be able to collect a commission and, therefore, his counsel drafted a commission agreement. The agreement, signed by defendants and plaintiff, but not Gilman, provides for payment of 4% of the fixed annual rent as commission on the leases. A payment schedule was outlined, specifying the obligations of the parties during a six year payment schedule. The commission was $1,300,000 for two leases, the one to AMC was $972,600, and the other to The Fitness Center (TFC) was $404,464. The contingent lease with AMC did not go into effect. Apparently, defendants did not enter into a lease with TFC, as no evidence was produced to show that there was anything besides negotiations with TFC.
Although paragraph 2.3 of the commission agreement states that a commission is due and payable upon the signing of the agreement, paragraph 3 sets forth a payment schedule for the commission to be paid from money obtained from the construction draws and rent. Similarly, while paragraph 5.1 states that the owner will be in default upon insolvency and paragraph 5.3 accelerates "all payments not yet made" upon such default, the parties knew that the owner was indeed insolvent at the time of the signing of the agreement. Further, paragraph 8.5 conditions the owner's ability to pay the commission upon the owner obtaining financing:
Owner represents that it has the financial capability to complete the underlying lease transaction and make payments on this commission, said representation to be conditionally accepted subject to owner obtaining financing.
The plaintiff described his understanding of the defendants' situation as follows:
Despite the entitlement, it was unrealistic to insist that the commission be paid at the time of the signing. Each one of the partners specifically told me during negotiations that it was absolutely impossible for any one of them or even all three together to make any kind of payment without financing. Each of the Baileys told me that he was unable of [sic] pay in advance of financing on the project. They told me that without the lease they would definitely lose the property, that they could not obtain financing as things stood, that their overall liabilities were greater than their assets; any commissions would have to come out of the financing for this *449 deal. Specifically, they told me that the only way a commission could be paid would be for the brokers to get paid out of the first construction draw and thereafter as rent was paid.
Nonetheless, plaintiff maintains in his brief on appeal that because he believed the defendants were insolvent at the time they signed the agreement, he wanted the ability to enforce the agreement whether or not the lease was consummated.
The partnership attempted to obtain financing for the construction project, simultaneously seeking municipal board approval for the rezoning of the property and site plan approval. Throughout this process, both realtors were heavily involved in assisting the parties to obtain the construction financing needed and the board approvals required. All were aware that, unless the construction financing was obtained and the approvals received, the deal would fall through with AMC and the property would be lost in foreclosure. Ultimately, the defendants were unable to obtain the construction financing, the municipal approvals were never received, Midlantic foreclosed on the land, and the AMC lease was voided and no rent was ever paid.
While it is clear that the Chancery Division may vacate an ADRA umpire's award for "committing prejudicial error by erroneously applying law to the issues and facts presented for alternative resolution," it does not appear, however, that any further appeal or review to this court is permitted under the statute. N.J.S.A. 2A:23A-13(c)(5); N.J.S.A. 2A:23A-18(b); Draftsman's Legislative History, N.J.S.A. 2A:23A-1 to -19 (1987 Ed. at 32) (stating that "[t]he only appeal of an umpire's award contemplated by the NJADR Act is an expedited summary review to the Chancery Division of the New Jersey Superior Court"); cf. Tretina Printing, Inc. v. Fitzpatrick & Assoc., Inc., 135 N.J. 349, 357-58, 640 A.2d 788 (1994) (under the Arbitration Act or common law arbitration procedures an appellate court may review a decision, but may not vacate due to the arbitrator's mistaken interpretation of the law). The parties have not in their briefs or at oral argument questioned the jurisdiction of this court and we have, therefore, decided the legal issue presented without dismissing the appeal on this ground, although it appears such action would otherwise be appropriate. N.J.S.A. 2A:23A-18(b). We take the *450 defendants' failure to move to dismiss as an assent to jurisdiction without intending to set any precedent for such appeal or review in the future.
The umpire and judge concluded that because the contemplated building was never built and, therefore, the lease with AMC was never consummated and no rents or construction draw ever became available, that paragraph 3, the payment schedule, and paragraph 5, pertaining to default and consequences, never became applicable. They concluded that a contrary interpretation of the contract would contravene the obvious intention of the parties, as expressed through the payment schedule, the relationship of the parties, and the fact that any commission was to be derived from the payment of the construction draws and rent. They saw this result as compelled since all parties to the contract were on notice that the defendants had no money and were in desperate need of financing, which they were attempting to arrange, but which they might not achieve.
Plaintiff urges that the insolvency provision is independent of the payment schedule and that the plain language of the contract entitles him to a commission regardless of whether or not the leases ever came to fruition. Plaintiff argues that it was legal error to go outside of the contract to find a "trigger" that was not expressed in the document. Thus, the issue is whether the umpire erred in interpreting the contract to mean that the contingent lease with AMC needed to reach at least the payment stage, a prerequisite of which was that the defendants obtain constructive financing, in order for paragraphs 3 and 5 to apply.
It is not the court's function to make a contract for the parties or to supply terms that have not been agreed upon. Temple v. Clinton Trust Co., 1 N.J. 219, 225, 62 A.2d 690 (1948); See also 3 Corbin on Contracts § 541 (1960). When terms of a contract are clear, "it is the function of the court to enforce it as written and not to make a better contract for either party." U.S. Pipe & Foundry Co. v. American Arbitration Ass'n., 67 N.J. Super. 384, 393, 170 A.2d 505 (App.Div. 1961). Nevertheless, it is clear that a contract must be interpreted considering the surrounding *451 circumstances and relationships of the parties, at the time it was entered into, to understand their intent and to give effect to the nature of the agreement as expressed on the written page. Marchak v. Claridge Commons, Inc., 134 N.J. 275, 282-83, 633 A.2d 531 (1993); Jacobs v. Great Pacific Century Corp., 104 N.J. 580, 586-87, 518 A.2d 223 (1986); Newark Publishers' Assn. v. Newark Typographical Union, 22 N.J. 419, 426-27, 126 A.2d 348 (1956); Krosnowski v. Krosnowski, 22 N.J. 376, 386-87, 126 A.2d 182 (1956); Wheatly v. Sook Suh, 217 N.J. Super. 233, 239-40, 525 A.2d 340 (App.Div. 1987); Renee Cleaners, Inc. v. Good Deal, etc., 89 N.J. Super. 186, 190, 214 A.2d 437 (App.Div. 1965).
In Krosnowski, the plaintiff sought to foreclose a mortgage on a property held by defendant. Krosnowski, supra, 22 N.J. at 377, 126 A.2d 182. The plaintiff sought this under a provision of the mortgage which provided for the "immediate payment of principal and interest in the event of a `default in the performance' of the mortgage or a contemporaneous agreement in writing between the parties." Id. at 378, 126 A.2d 182. The plaintiff contended that the acceleration clause "`was enforceable according to its terms, whether or not there was also an acceleration of the debt owed by the defendant-mortgagee to the plaintiff, for which the mortgage was assigned as collateral security.'" Id. at 383, 126 A.2d 182. The Court found that the acceleration clause was unenforceable and stressed that the contract must be considered as a whole and interpreted as a business transaction "`entered into by practical men to accomplish an honest and straightforward end.'" Id. at 387, 126 A.2d 182. In explaining why the acceleration clause was not applicable the Court stated:
But this principle of general application in other and different circumstances, designed to fulfill the common intention of the parties, as a measure essential to the protection of the security, is not by the same token relevant where there is a reasonably discernible intention contra, relating the whole of the contractual expression to the situation and circumstances of the parties, or the manifestation of intention is vague or ambiguous, and there comes into play the rule that in its very nature an acceleration clause is construed strictissimi juris.

[Id. at 383, 126 A.2d 182.]
Therefore, the Court declined to follow a strict construction of the language of the contract, concluding that to do so would defeat the obvious purpose of the document:

*452 [P]laintiff's interpretation gives the literal sense of particular terms, isolated from the context, ascendancy over the reason and spirit of the whole of the contract, expressed in the mortgage and the agreement, assessed in relation to the circumstances and the situation of the parties and the objects they were striving to attain.
[Id. at 385, 126 A.2d 182 (citations omitted).]
Defendants' argument that the contract obviously contemplated the receipt of the construction draws and rent as a precondition of the commission payments is persuasive. Under section 3.3 "[t]he first payment shall be made within thirty days of the last construction take down or within three business days of the first payment of rent, whichever occurs first." Likewise, paragraph 3.5 relieves the owner of liability for the commission if the tenant fails to pay rent. This is in accordance with the understanding that the tenant's rent would be the source of income for the commission. Moreover, paragraph 8.5 states, "Owner represents that it has the financial capability to complete the underlying lease transaction and make payments on this commission, said representation to be conditionally accepted subject to owner obtaining financing." This demonstrates that the contract terms recognize that payment of the commission was made contingent upon defendants obtaining financing. Thus, financing was an essential and indispensable component of the contract, a necessary precondition to the going forward of the construction and lease.
"The construction of a written instrument `to be adopted is the one which appears to be in accord with justice and common sense and the probable intention of the parties. It is to be interpreted as a business transaction entered into by practical men to accomplish an honest and straightforward end.'" Krosnowski, supra, 22 N.J. at 387, 126 A.2d 182. The "judicial interpretive function is to consider what was written, in the entire context of the circumstances under which it was written, and to accord the language a rational meaning in keeping with the expressed general purpose." Jacobs, supra, 104 N.J. at 586, 518 A.2d 223.
Plaintiff's interpretation would give the "literal sense of particular terms, isolated from the context, ascendancy over the *453 reason and spirit of the whole of the contract ... assessed in relation to the circumstances and the situation of the parties and the objects they were striving to attain," which is to be avoided. Krosnowski, supra, 22 N.J. at 385, 126 A.2d 182. The language of the contract and the interrelation of its provisions suggest that the default clause was not to take effect until the defendants obtained financing, thus enabling defendants to receive the contemplated construction draws and rent that the payment schedule sets out so clearly as the source of the commission. The relationship of the parties and their knowledge of the situation makes clear that the plaintiff knew that the only way he would receive a commission would be if the defendants obtained financing. Defendants reasonably concluded that plaintiff was agreeing to this and, indeed, viewed objectively, the whole tenor of the contract appears to require payment of plaintiff's commission only according to the construction draws and rents. We conclude, as did the umpire, that the provision that the commission was earned upon signing the agreement should not override those making any commission contingent upon the defendant obtaining financing for the construction of the building that would produce the construction draws and rents. We, therefore, affirm.
Affirmed.